# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL KRAMER, | ) |
|                  Plaintiff, | ) |
| v. | ) Civil Action No. 13-606 |
| ANTHONY GRILLO, RUSSELL, BAKER, GARY SCHUBERT, and WILLIAM WEBER, | ) |
|                  Defendants. | ) |

## **OPINION**

CONTI, Chief District Judge

### I. Introduction

In this civil rights case asserted under 42 U.S.C. § 1983, a jury returned a unanimous verdict in favor of plaintiff Michael Kramer ("Kramer" or "plaintiff") and against defendant William Weber ("Weber"). The jury determined that Weber violated Kramer's due process right to receive medical care for his serious medical needs while in police custody, which is guaranteed by the Fourteenth Amendment to the United States Constitution ("due process claim"). The jury awarded Kramer $1,000 in compensatory damages for physical harm and $1,000 in compensatory damages for mental/emotional suffering. (ECF No. 252 at 5-6.) The jury also returned a unanimous verdict in favor of defendants Russell Baker ("Baker"), Anthony Grillo ("Grillo"), and Gary Schubert ("Schubert") with respect to Kramer's due process claim and § 1983 claims based upon Kramer's right to be free from excessive force under the Fourth Amendment.

Weber argues that under Federal Rule of Civil Procedure 50(b) he is entitled to judgment as a matter of law because Kramer did not present evidence from which the jury could find that Weber violated Kramer's § 1983 rights by being deliberately indifferent to Kramer's serious

medical needs. (ECF No. 257.) Kramer opposes Weber's motion and points to evidence presented in his case-in-chief to show that Weber acted with deliberate indifference to Kramer's serious medical needs.

As fully explained in this opinion, the jury's verdict with respect to the due process claim tried against Weber is supported by the evidence presented in Kramer's case-in-chief. Even if Weber is correct that Kramer failed to present sufficient evidence in his case-in-chief with respect to that claim, however, the court must consider the entire record of evidence from trial, including evidence presented by Weber in his case-in-chief, to decide the Rule 50(b) motion. Trustees of Univ. of Pa. v. Lexington Ins. Co., 815 F.2d 890, 903 (3d Cir. 1987). Upon consideration of the record as a whole, including Kramer's testimony and Weber's testimony, Weber is not entitled to judgment as a matter of law and the jury's determination that Weber acted deliberately indifferent to Kramer's serious medical needs is supported by the evidence. The Rule 50(b) motion will, therefore, be denied.

## II. Evidence at Trial

### A. Kramer's case-in-chief

Kramer testified that on July 16, 2011, he was at an apartment with the address of 1818 ½ Kenneth Avenue, Arnold, Pennsylvania (the "apartment"). (H.T. 1/16/2018 (ECF No. 342) at 11.) He was at the apartment with Qwenda Reed ("Reed"), Reed's son, and the son's girlfriend. The apartment was located above a large garage. (Id. at 11-12.) The apartment had two small bedrooms, a small living room, which was used as a bedroom, a small kitchen, and a balcony. (Id. at 12, 16.) On that day, police officers approached the apartment while Kramer was on the balcony of the apartment smoking a cigarette. (Id. at 12, 20.) The only ways to access the balcony were via a door in the living and a window on each side of the door. (H.T. 1/16/2018 (ECF No. 342) at 14.) There

2

were no stairs that lead to the balcony. (Id.) The balcony was approximately two and one-half stories high and approximately ten to twelve feet from the ground. (Id. at 17.) Directly beneath the balcony was a concrete area and an unkempt grassy area. (Id. at 19.)

Kramer, who had absconded from parole for an armed bank robbery and was "on the run," saw the police approaching the apartment in their vehicles and believed that they were at the apartment to arrest him. (Id. at 12, 21, 27.) Kramer heard police officers exit their vehicles and approach the door on the ground level, which provided access to the apartment. (Id. at 21.) The police officers banged on the door saying "open up police." (Id.) Kramer instructed Reed to let the police officers inside the apartment. (Id.) The police officers entered the residence and travelled upstairs to the apartment. (Id. at 25.) The door leading into the living room of the apartment opened up and Kramer "voiced that…[he was] out on the balcony." (Id. at 26.) Kramer testified:

> I surrendered, and Officer Russell Baker pulls the door back towards like to close it. Sees me standing there holding the screen door open with my hands up and rushes forward, and I believe---I personally believe that he was going to grab me up.
> …
> [H]e actually shoved me backwards, and the momentum of his shove took me over the balcony rail.

(Id.) According to Kramer, after Baker shoved him, the balcony rail hit the back of his legs, his feet went up, and he fell over the balcony. (Id. at 31.) He hit the ground "hard," there was "basically a blackness," and by the time he came to, he was on his stomach with a "searing pain in his neck." (Id. at 33.) Kramer's arms were "not functioning right[,]" i.e., he attempted to stand up but his arm was not working. (Id.) He had "extreme pain" in his neck, was crying, and "thrashing around on the ground." (Id.) Kramer did not know whether he landed on the concrete area under the balcony or in the unkempt grassy area under the balcony. (Id.) He tried to reach back to his neck, but his arms and legs were not working properly so he just laid on his stomach "thrashing about." (Id.)

3

According to Kramer, he did not stand up and walk or run after the fall. (Id. at 36.)

Kramer did not know whether Baker was the first officer through the apartment door. He testified:

> I don't know the guys came up before him and fanned out to other areas and he just happened to be one to look behind the door or maybe he was the first one that came up and they had not yet cleared the steps yet, but I did not see any other officers. Only ones I saw was Officer Russell Baker.
> …
> He was the only person I was concerned with and what happened happened.

(H.T. 1/16/2018 (ECF No. 242) at 26-27.) When asked about his perceptions of the police officers after he landed on the ground beneath the balcony, Kramer testified as follows:

> My next perception of the officers was them – officers yelling, Don't move, stay on the ground, and I felt a pain in my neck, officers grabbing my arms and one of the officers put his knee into my back. I guess they were attempting to restrain me, and so I believe there was to be either two or three officers. One had his knee in my neck trying to keep my head down on the ground. I believe he had one of my arms pinned. Another one had his knee in my back, and I believe another one was holding my legs.
>
> At that time, you know, I voiced there was something wrong with me and I needed medical attention, and they told me to put my arms behind my back, and like I said, my arms weren't functioning right, so they may have interpreted, you know, being stiff that I was trying to not do it, but they eventually got my arms behind my back and cuffed me.

(H.T. 1/16/2018 (ECF No. 242) at 34.) Kramer testified that he told the officers: "My neck, I need medical attention. There's something wrong with me." (Id. at 35.)

Kramer was unable to stand up on his own; rather, two police officers lifted him up by arms and escorted him to a police car where they opened the car door for him and helped to place him into the police car. (Id. at 37.) Kramer's physical pain was worsening at that point. (Id.) Kramer asked for medical help on the way to the police car. (Id. at 38.) Kramer was driven to the New Kensington police station. (Id.) After being transported to SCI Pittsburgh, a state prison, Kramer was taken by prison officials to Allegheny General Hospital, where he was diagnosed with

4

a "C1 fracture," placed in a "C collar,"[1] and prescribed medication for six to eight weeks. (H.T. 1/17/2018 (ECF No. 243) at 3.) At the time of trial, Kramer was still in physical pain and only recently stopped taking pain medication. (Id. at 9.)

At trial, the following questioning took place between Kramer and his counsel with respect to the identities of the police officers that arrested him:

> Q. Did you know which officers were arresting you?
>
> A. To be honest, I can't say that I do just because of the nature of my injuries, and that's all that I was focusing on. I learned who it was that arrested me based off the police report when I got it after charges was [sic] filed against me.
>
> Q. The officers that you named off the police report, are those the four defendants?
>
> A. Correct.

(Id. at 36.)

**B. Evidence introduced by Weber, Baker, Grillo, and Schubert with respect to Weber**

Weber was a police officer for the City of Arnold at the time the events took place in this case. (H.T. 1/18/2018 (ECF No. 244) at 61.) He was also a certified emergency medical technician ("EMT") for the State of Pennsylvania and a certified "firefighter 2" in Pennsylvania. (Id. at 87-89.) Prior to 2011, Weber was an EMT on approximately 9,000 calls, which included calls involving individuals who suffered physical trauma and falls. (H.T. 1/19/2018 (ECF No. 245) at 105-06.)

On July 16, 2011, Weber received a telephone call from Grillo informing him that the Federal Bureau of Investigation had an arrest warrant for Kramer for bank robbery and that Kramer

---

[1] Kramer testified that a "C collar" is "a large strap that they strap around your neck in order to stable your neck. It's kind of on there so you can't really move your neck and it's strapped on." (H.T. 1/17/2018 (ECF No. 243) at 4.) Kramer wore his "C collar" for eight weeks. (Id.)

5

was "possibly coming to a location located in the City of Arnold." (H.T. 1/18/2018 (ECF No. 244) at 63.) Weber testified that he travelled to the apartment with police officers from New Kensington. (Id.) Weber's police report of the July 16, 2011, incident noted that Grillo and Weber were the officers who approached the apartment and spoke with Reed. (Id. at 66-67.) Weber, Grillo, and Baker went inside the apartment while Schubert and John Carilli, another police officer, waited outside the residence. (Id. at 67.)

Weber testified that once they entered the apartment Grillo encountered a black male, who Weber eventually learned was Kramer, sitting on the toilet in the bathroom. (Id. at 69.) Weber and Baker checked the other rooms of the apartment to determine whether there were any other individuals in the apartment. (Id. at 70.) By the time Weber and Baker finished checking the apartment for other people, Kramer had exited the living room and handed Grillo a source of identification. (Id.) Grillo looked at the identification and told Kramer "this isn't you." (Id.) Weber then testified:

> At that point, the black male, he may have said something in response to Officer Grillo, but I can't remember if he did or not, turns. The stairwell door is closed, because first, we don't want anybody coming up behind us, nor do we want anybody leaving the small confines of the place.
>
> He opens the door out on to the balcony. At this point, we're not too much concerned, because there's no way off the porch, you know. There's no staircase, so fine, we feel that he's confined, this black male. He leaps over the railing into the front yard between 1818 front and 1818 rear.
>
> At that time, being that we have no other occupants of the apartment, we start down the steps and Officer Schubert that was positioned in between the two buildings had radioed that he's running towards the front street, Kenneth Avenue. We get out there. Naturally, they're in a foot pursuit. I go to the rear and get in my patrol car and go. I'm kind of a little old and I can cover more ground with a patrol car than I can having nine guys or eight guys or six guys in a foot pursuit with the same individual, so I got back in my patrol car.

(Id. at 71.) Weber drove to a vacant lot where he saw Kramer "facedown with officers surrounding

6

him." (Id. at 72.)

The first time Weber saw Kramer after Kramer jumped from the balcony was in the vacant lot after the foot chase. (H.T. 1/19/2018 (ECF No. 245) at 104.) According to Weber, "[t]here was nothing obvious" about Kramer that indicated that he had a neck injury, he did not verbally express that he was in pain, and there was "no way outwardly" that Weber could tell that he was in pain. (Id. at 104-05.) Kramer was handcuffed and placed into a police car from Lower Burrell. (Id.) Officers from the Lower Burrell police department transported Kramer to the New Kensington police station. (Id. at 73.) Weber was within earshot of Kramer while Kramer was being arrested for two to three minutes. (Id. at 86.) Weber testified that he did not hear Kramer calling for help or saying that he was hurt. (Id. at 86-87.)

The next time Weber saw Kramer, Kramer was walking unassisted down a hallway at the New Kensington police station. (Id. at 108-09.) Weber and the other officers involved in arresting Kramer did not know who Kramer was at that time. (Id. at 74.) At the New Kensington police station, Weber sat approximately one to two feet across from Kramer for approximately one minute and thirty seconds and placed Kramer on "Live Scan[,]" which "is a jointly run fingerprint" system used for identification. (Id. at 73-74; H.T. 1/19/2018 (ECF No. 245) at 109, 112.) Prior to running Kramer's fingerprint through the Live Scan system, Kramer admitted his identity to Weber, i.e., he was Michael Kramer. (H.T. 1/18/2018 (ECF No. 244) at 74.) At that point, Weber turned off the Live Scan system, turned Kramer over to the New Kensington police officers, and returned to his station to write a police report. (Id.)

Counsel for Kramer questioned Weber about why he did not call an ambulance for Kramer after witnessing Kramer fall from a two and one-half story balcony. (H.T. 1/18/2018 (ECF No. 244) at 90.) Weber responded:

7

> If he was in the yard after the fall, he would have been flown from that location to Pittsburgh hospital, because the protocol is anything over a ten foot fall, you have to start thinking of head injury and to go. Your client, the plaintiff, leaped off the porch and then ran for about two and a half blocks, 20 minutes or so foot chase and basically was put in a police car and had no obvious signs to me, as a trained individual with my EMT, that he needed any treatment at all.

(Id. at 90-91.) Weber further explained:

> If he was laying in the yard and not moved, the mechanism -- the protocol for mechanism of injury, if it's over a ten foot fall, you know, he'd very possibly need to be sent in to the city to a trauma unit, but he was not in the yard. The next time I seen him, he was two and a half city blocks away from the location that I first encountered him and, you know, he does not outwardly have any signs to me that there was a problem, you know.
>
> Everything is functioning pretty good or he would have still been back in the yard, so my assumption would be that he had no injuries at that time.

(Id. at 92-93.) Counsel for Kramer then asked Weber whether after Kramer fell from the two and one-half story balcony Weber was in a position to assess Kramer's medical condition. (Id. at 91.) Weber responded:

> Yes, sir, and if you refer to my report, I also am the one that put him on Live Scan, and I was probably closer than myself and the court reporter in a lighted hallway in front of the Live Scan machine.

(Id.)

Weber estimated that on July 16, 2011, he was a few feet from Kramer for a total of ten to fifteen minutes. (H.T. 1/19/2018 (ECF No. 245) at 112.) He testified that he was inside the apartment with Kramer for three to four minutes, with Kramer at the vacant lot for two to three minutes, and the rest of the time was spent at the New Kensington police station. (Id. at 112-13.) Weber explained the procedure he would have used if he believed Kramer required medical attention. (Id. at 110-11.) Weber agreed with Kramer's counsel that "some internal injuries" sustained from a fall of more than ten feet cannot be "ascertain[ed]…just visually[,]" and, therefore, "the default is medical attention[.]" (Id. at 121-22.) Weber, however, did not think that

8

Kramer required medical attention. (Id. at 123.)

### III. Standard of Review

Rule 50 provides, in pertinent part:

**(a) Judgment as a Matter of Law.**

*(1) In General.* If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:

> **(A)** resolve the issue against the party; and
>
> **(B)** grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

…

**(b) Renewing the Motion After Trial; Alternative Motion for a New Trial.** If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment--or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged--the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:

> (1) allow judgment on the verdict, if the jury returned a verdict;
>
> (2) order a new trial; or
>
> (3) direct the entry of judgment as a matter of law.

FED. R. CIV. P. 50.

Under Rule 50(b), the court must determine "whether 'viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.'" Eshelman v. Agere Sys., Inc., 554 F.3d 426, 433 (3d Cir. 2009) (quoting Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993)). "Although judgment as a matter of law should be granted

sparingly, [the court shall] grant it where 'the record is critically deficient of the minimum quantum of evidence' in support of the verdict." Eshelman, 554 F.3d at 433 (quoting Gomez v. Allegheny Health Servs., Inc., 71 F.3d 1079, 1083 (3d Cir. 1995)). The Third Circuit Court of Appeals has instructed that "[i]n performing this narrow inquiry, [the court] must refrain from weighing the evidence, determining the credibility of witnesses, or substituting [its] own version of the facts for that of the jury." Eshelman, 554 F.3d at 433 (quoting Marra v. Phila. House. Auth., 497 F.3d 283, 300 (3d Cir. 2007)).

### IV. Discussion

#### A. Applicable Law

Section 1983 claims for denial of adequate medical care filed by pretrial detainees are analyzed under the Fourteenth Amendment to the United States Constitution. Richardson v. PrimeCare Medical, Inc., Civ. Action No. 16-5490, 2017 WL 2957827, at *5 (E.D. Pa. July 10, 2017) (citing King v. Cnty. of Gloucester, 302 F. App'x 92, 97 (3d Cir. 2008)). The elements of the claim are: (1) the pretrial detainee had "a serious medical need,"[2] and (2) "acts or omissions by [state actors]…that indicate deliberate indifference to that need."[3] Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003) (citing Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999)). Here, Weber does not dispute that the evidence presented by Kramer was sufficient for the jury to find that Kramer had a serious medical need; indeed, the evidence showed that Kramer was

---

[2] This is recognized as the "objective" element of the claim. Montgomery v. Pinchak, 294 F.3d 492 (3d Cir. 2002) (The "plaintiff must make an 'objective' showing that the deprivation was 'sufficiently serious,' or that the result of defendant's denial was sufficiently serious.").

[3] This is recognized as the "subjective" element of the claim. Montgomery, 294 F.3d at 499 ("[T]he plaintiff must make a 'subjective' showing that defendant acted with 'a sufficiently culpable state of mind.'").

10

diagnosed with a C1 fracture of his neck. (H.T. 1/17/2018 (ECF No. 243) at 3.) Weber argues that the evidence presented by Kramer does not support the jury's determination that Weber acted with deliberate indifference to Kramer's serious medical need because "[n]one of the evidence Plaintiff presented identified Weber; placed Weber at the scene of Plaintiff's arrest; or otherwise implicated Weber's involvement with the events surrounding Plaintiff's arrest on July 16, 2011." (ECF No. 258 at 2.)

"Deliberate indifference is a 'subjective standard of liability consistent with recklessness as that term is defined in criminal law.'" Natale, 318 F.3d at 582 (quoting Nicini v. Morra, 212 F.3d 798, 811 (3d Cir. 2000)). "In order to find that state officials acted with deliberate indifference, a plaintiff must prove that the official knew of and disregarded an excessive risk to…[the plaintiff's] health or safety." Lawrence v. Netzlof, Civ. Action No. 10-433, 2012 WL 4498834, at *9 (W.D. Pa. Sept. 28, 2012) (citing Natale, 318 F.3d at 582). The Third Circuit Court of Appeals has explained:

> We have found "deliberate indifference" in a variety of circumstances, including where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment. See Durmer, 991 F.2d at 68 (citing Monmouth County Correctional Inst. Inmates v. Lanzaro, 834 F.2d 326, 346–47 (3d Cir.1987)). We also have found "deliberate indifference" to exist where the prison official persists in a particular course of treatment "in the face of resultant pain and risk of permanent injury." Napoleon, 897 F.2d at 109–11 (holding that allegations of several instances of flawed medical treatment state a claim under Eighth Amendment).

Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).

The court will analyze the evidence presented at trial—without engaging in credibility determinations—to determine whether there was sufficient evidence presented to support the jury's finding that Weber acted with deliberate indifference to Kramer's serious medical needs.

### B. Whether the court may consider evidence offered by Kramer and evidence offered by Weber and the other defendants to decide the Rule 50(b) motion

Weber argues that Kramer in his case-in-chief did not prove that Weber was involved in Kramer's apprehension or arrest, and, under those circumstances, the jury's determination that Weber acted deliberately indifferent to Kramer's serious medical needs is not supported by the record. The court's review of the record, however, is not limited to the evidence presented in Kramer's case-in-chief. The case law interpreting the reasoning behind Rule 50 supports the court considering *all the evidence presented*, including the evidence presented by Weber, to decide the pending Rule 50(b) motion.

In order for the court to consider a Rule 50(b) motion by a party after the jury verdict (traditionally referred to as "judgment n. o. v."), that party must have previously moved for judgment as a matter of law pursuant to Rule 50(a) on that issue (traditionally referred to as a "directed verdict"). Mallick v. Int'l Broth. of Elec. Workers, 644 F.2d 228, 233 (3d Cir. 1981). Rule 50(a)(2) requires that a Rule 50(a) motion must "specify the judgment sought and the law and facts that entitle the movant to the judgment." FED. R. CIV. P. 50(a)(2). Courts have interpreted this provision to require enough specificity to put the opponent on notice so that he may cure any possible technical defects in his case. Acosta v. Honda Motor Co., 717 F.2d 828, 831-32 (3d Cir. 1983). The United States Court of Appeals for the Third Circuit explained the reasoning behind enabling an opponent to cure defects in Acosta:

> Rule 50(b) is essentially a notice provision that, among other functions, protects the important seventh amendment right of trial by jury. A motion for a judgment n.o.v. must be preceded by a motion for a directed verdict sufficiently specific to afford the party against whom the motion is directed an opportunity "to cure possibly technical defects in proof which might otherwise make his case legally insufficient. A motion for judgment notwithstanding the verdict made after trial, in the absence of prior notice of the alleged defect, comes too late for possibly curative action, short of a completely new trial. Thus, whether or not the Constitution compels the rule forbidding a party to advance by judgment notwithstanding the verdict motion

12

a ground not first advanced in a motion for directed verdict, the rule is certainly consistent with the general spirit animating the Federal Rules of Civil Procedure. That spirit suggests avoidance of surprises and tactical victories at the expense of substantive interests."

Id. (quoting Wall v. United States, 592 F.2d 154 (3d Cir. 1979)).

Even if a court errs in denying a Rule 50(a) motion, the error can be cured by evidence offered by the *moving party*. 9B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2534, at 523-34 (3d ed. 2008) (citing Trustees, 815 F.2d at 903). The court of appeals in Trustees explained:

> By proceeding to offer evidence in its own defense, a defendant waives the right to a directed verdict.[4] If the motion for directed verdict is renewed at the close of all the evidence, the court will decide it according to the record as it then stands. Peterson v. Hager, 724 F.2d 851 (10th Cir. 1984); 9 J. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2534 (1971) (initial error by district court "is cured if subsequent testimony on behalf of the moving party repairs the defects of his opponent's case"); 5A J. MOORE & J. LUCAS, MOORE'S FEDERAL PRACTICE ¶ 50.05 [1] (2d ed. 1986) (same). Accordingly, any defects in [the plaintiff]'s case in chief were cured by evidence adduced during [the defendant]'s defense.

Trustees, 815 F.2d at 903.

In this case, the court deferred ruling on Weber's Rule 50(a) motion. Weber testified in the case presented by Baker, Grillo, and Schubert, and offered evidence on his own behalf in his own case. Weber, therefore, waived his right to judgment as a matter of law under Rule 50(a). To decide Weber's Rule 50(b) motion, the court will consider *all the competent evidence* presented, including the evidence that was presented after Weber made his Rule 50(a) motion during trial.

### C. Whether the evidence presented supports the jury's determination that Weber acted with deliberate indifference to Kramer's serious medical needs

The court must determine "whether 'viewing the evidence in the light most favorable

---

[4] "Directed verdict" was the terminology used for a motion for judgment as a matter of law pursuant to Rule 50(a) prior to the 1991 revision to Rule 50.

to…[Kramer] and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find'" that Weber acted with deliberate indifference to Kramer's serious medical needs. Eshelman, 554 F.3d at 433 (quoting Lightning Lube, 4 F.3d at 1166). In other words, the court must determine whether "'the record is critically deficient of the minimum quantum of evidence' in support of the verdict." Eshelman, 554 F.3d at 433 (quoting Gomez, 71 F.3d at 1083). For the reasons that follow, there was sufficient evidence for the jury to find that Weber acted with deliberate indifference to Kramer's serious medical needs.

Kramer testified that

- on July 16, 2011, more than one police officer entered the apartment;

- Baker caused him to fall from the balcony of the apartment, which was two and one-half stories high;

- after the fall, he laid on the ground and did not get up and walk or run away;

- while he was laying on the ground, he was crying in pain and thrashing about;

- police officers placed him under arrest by grabbing his arms, placing a knee into his back, and holding his legs;

- the police officers had to help him stand up and escort him to the police car;

- while being arrested and again on the way to the police car, he voiced that there was something wrong with his neck and he needed medical attention;

- the police officers at the scene did not provide him medical attention;

- he was diagnosed with a C1 neck fracture, placed in a neck collar, endured emotional and physical pain, and took pain medication for more than five years;

- at the time he was arrested, he did not know the identities of the police officers who arrested him;

- he later learned the identities of the officers who arrested him via a police report; and

14

- the four police officer defendants in this case, i.e., Baker, Grillo, Schubert, and Weber, were the four officers who arrested him.

Although it is a close case, the foregoing evidence that was presented in Kramer's case-in-chief is sufficient to support the jury's finding that it was more likely than not that Weber acted with deliberate indifference to Kramer's serious medical needs. Weber does not dispute that Kramer had a serious medical need. If the jury believed the evidence presented by Kramer, it had a sufficient basis to conclude that it was more likely than not that: Kramer fell from a balcony that was ten to twelve feet in the air; he laid on the ground crying in pain, thrashing about, and unable to stand on his own; he had to be escorted to the police car; he requested medical attention from the police officers at the scene; Weber was one of the arresting officers at the scene on July 16, 2011; and none of the officers, including Weber, provided Kramer medical assistance. The jury could have concluded based upon circumstantial evidence that because Weber was an arresting officer and Kramer testified that he was crying in pain and twice requested medical attention during the arrest, that Weber was aware of Kramer's serious medical need. Under those circumstances, Weber would not be entitled to judgment as a matter of law even if the court did not consider evidence presented by Weber.

As discussed above, however, because Weber proceeded to offer evidence on his own behalf after the court denied his Rule 50(a) motion, the court must consider the record as a whole to decide the Rule 50(b) motion. The jury's verdict is well-supported by the evidence presented in Kramer's case-in-chief *and* Weber's own testimony. Weber testified that:

- he is a trained EMT and firefighter;
- he has experience as an EMT with responding to more than 9,000 calls, which included calls involving individuals who suffered physical trauma and falls;
- he was one of the three police officers that entered the apartment on July 16, 2011;

- he saw Kramer jump off the balcony, i.e., he knew Kramer went over the balcony, which was more two and one-half stories high or ten to twelve feet from the ground;
- after Kramer jumped off the balcony, he went outside the apartment;
- he saw the police officers place handcuffs on Kramer and escort him to the police car;
- the protocol to follow if a person fell from more than ten feet and laid there would be to send the person to a trauma unit;
- he saw Kramer being escorted to the police car;
- he interacted with Kramer inside the New Kensington police department;
- he sat close enough to Kramer that he could assess Kramer's medical condition; and
- he did not provide Kramer any medical attention.

Viewing the evidence in the light most favorable to Kramer, there was sufficient evidence from which the jury could reasonably find that it was more likely than not that Weber knew Kramer needed medical attention and intentionally refused to provide it to him. Rouse, 182 F.3d at 197 (explaining that deliberate indifference may be found when, among other things, the state official knows a person in his or her custody needs medical treatment and intentionally refuses to provide it). The jury may have believed Kramer that once he fell from the two and one-half story balcony he: laid on the ground; was arrested in the backyard of the apartment; only stood up after receiving assistance from the police officers; and voiced that he was in pain and required medical attention during the arrest and as he was being led to the police car. Weber testified that after Kramer jumped from the balcony, Weber went outside, got into his patrol car, and later at a location separate from the apartment saw police officers handcuffing Kramer and leading him to the police car. The jury may have discredited the evidence offered by Weber and found that Kramer laid in the backyard of the apartment after he jumped or was pushed off the balcony and his arrest took place in that location. In other words, the jury may have believed that Kramer did not get up and run from the

apartment after he was pushed or jumped off the balcony and, instead, laid there injured and requesting help from Weber who witnessed the arrest. In light of the evidence that the balcony was ten to twelve feet from the ground and Weber's testimony that the proper procedure is to transport someone to a trauma unit if they fall from more than ten feet off the ground, the evidence was sufficient for the jury to find that Weber (1) was on scene on July 16, 2011, and (2) knew Kramer needed medical attention and intentionally refused to provide it to him. The jury's verdict in favor of Kramer and against Weber was, therefore, supported by the evidence of record at trial.

## V. Conclusion

Even if the court's review of the evidence was limited to Kramer's case-in-chief, Weber would not be entitled to judgment as a matter of law with respect to the due process claim. Because Weber offered evidence in his defense after his counsel made a Rule 50(a) motion for judgment as a matter of law, however, the court must consider the record as a whole in deciding the Rule 50(b) motion currently pending before the court. In consideration of all the evidence viewed in the light most favorable to Kramer and without making any credibility determinations, the evidence of record was sufficient for the jury to reasonably conclude that Weber acted with deliberate indifference to Kramer's serious medical needs. The Rule 50(b) motion (ECF No. 257) will be denied. An appropriate order will be entered.

BY THE COURT,

Dated: April 12, 2018 /s/ JOY FLOWERS CONTI
Joy Flowers Conti
Chief United States District Court Judge